the return of U.S. v. Claxton. Mrs. Moorhead. Good afternoon. My name is Susan Moorhead and I represent Craig Claxton. I would like to reserve three minutes rebuttal time. Thank you. Thank you. Well I'm back again and this time keep your voice up. This time our focus is on really the Sixth Amendment and the rights that are supposed to be afforded to a defendant in a criminal case. How much time did you request for rebuttal? Three minutes. Why are we down to five minutes already? Our arguments basically center around the fact that Mr. Claxton was not given a speedy trial. He was not, did not have an impartial jury and he did not have the opportunity to adequately confront witnesses against him and to have compelled other witnesses in his favor. We made our motion for a speedy trial act. It was requested at the arraignment that he be given a speedy trial and in our briefs we brief not just the speedy trial act, the statute, but the Sixth Amendment right that was breached and the government has not responded at all to that but what we have is a situation where we have an indictment that was looked at the marker factors and the delay is measured from the date of the arrest or the indictment, whichever is earlier. So we're starting with the date of December 19, 2006. April 23, 2008, Mr. Claxton was arrested at his family's home in Florida, 16 months after the indictment. The indictment was unsealed on that same date, April 23, 2008, in the district court so the prosecutors knew that he was already in custody as of that date. He waived his right to a detention hearing in Florida and made his initial appearance in Florida in the taken into custody and transferred to Guaynabo in Puerto Rico where he sat from April 25th through July 16, 2008. A total of 84 days without representation of any sort. He was incommunicado. He had his initial appearance in the district court in the district where the charge was pending in the Virgin Islands on July 16, 2008. This was almost 19 months after the indictment date. Bearing in mind that the indictment itself is alleging acts that occurred no later than 1999 through October 2005. There was an order of detention entered on July 21st and then on October 23rd, 2009, he filed his first motion for dismissal on the Sixth Amendment and the STA violations. Coming before us of the Sixth Amendment, the analysis requires a weighing exercise that takes into account the time period. Can you address that? How was your, in this limited time, how given these times and I realize that the district court did not express why he was excluding some of these times, but what would you would you address the prejudice? I think that there was actual prejudice first off in being detained for 84 days which is a time period which without explanation, without counsel, but following that I think that this rises to the presumption of prejudice that the courts have examined in, well the Hakeem case required review of all of the factors after 14 months. In this case, and Batiste found presumptive evidence I think after 45 months. In this case, the indictment date is a triggering date of 2006, December 19, 2006, and he was not brought to trial until May 2010. Did the delay in any way affect the evidence produced against him at trial as to things like illness, et cetera, you know all those things? Well, I would say certainly he was not part of the initial trial that was held I think in September 2007, so he and I was not his initial counsel in this case, but in terms of, you know, the memories of even the government's witnesses, I mean they all had to review all of their trial transcripts from all the many times previously that they testified in order to at least stick with that prior testimony. But when was he arrested? He was arrested April 23, 2008. So realistically your claim only runs from April till April 2008 till 2010. Well, the case law says that under Barker the delay is from the date of arrest or indictment, whichever is earlier. Here the indictment date was December 19, 2006. But isn't the...Gilbert Clayton was a fugitive during that period of time, though. It doesn't count. They characterized him as a fugitive, but they presented absolutely no evidence at any of the hearings, the detention hearings or any of the hearings. He was apprehended in the process of applying for a U.S. passport and giving his real name, his real address. He was staying with his family in Florida, and there was no testimony or evidence presented whatsoever that he was even aware that there was an indictment against him or that a warrant had been issued for his arrest. The fact that he applied for a passport showed he was about to take off. There is some evidence that...I see the government argues that, but I mean there are many, many reasons why people need to have picture identification, and that's just one form of it. He never had a passport before? I really don't know, Your Honor. That is not in the record. It appears that this was...he applied for a passport. He wasn't applying for a renewal of his passport. My understanding was that he applied for a passport. Yeah, so he wasn't applying for a renewal of a passport. And it seems strange that he must have gotten information from some of the co-defendants that there was an indictment out there or something was going on, was sealed, and he applies for a passport. Well, Your Honor, I think that that's complete speculation, and I don't think that people who apply for passports are automatically fugitives. There's nothing in the record that suggests that he was contacted by any of the co-defendants or by anybody and made aware of the case. That's just simply not in the record, so I don't think that it's correct to characterize him as a fugitive. Certainly, though, anybody is disadvantaged in trying to find witnesses. When you have a conspiracy that is so vaguely alleged and covering a span of six years, which preceded the date of the indictment by over a year, I think that we rise to the level of presumptive prejudice. Turning to all of the other factors, I don't think there's any question that they were all met. He made his request. The government provided no reason for its delay in apprehending him. They provided no evidence of attempts to apprehend him, and after having apprehended him, they gave no explanation for why he sat in Guayanaba for 84 days. If I may address the next issue about not having an impartial jury. We have a combination of extensive pretrial publicity for over a two-week period, or about a two-week period, about a case involving Gillian Mark and a police officer named Blyden. That involved the same Springett, Turnbull, the same drug lords and their henchmen, the same testimony about transporting the drugs from Venezuela to Tortola to the VI to the states. Identical testimony written about in the paper. The government, even at a pretrial hearing, admitted that they, too, were concerned about how pervasive this media blitz was about that case. That case was immediately before the case where Mr. Claxton was tried. And so we have the same jury panel, the same pool being selected from. And we have also the fact that Mr. Mark was actually dismissed from the case on the morning of jury selection. So the judge, everybody, all defense counsel, raised concern about proceeding, because the judge was not even going to voir dire the jury on whether or not he was going to be tried. Whether they knew Mr. Mark or not. And so the questions that related to pretrial publicity, they were asked simply, did they hear anything about our case, but not anything about the prior case that involved Mr. Mark, who was not going to be a party anymore in our case, and who is not going to be a witness. So his being dismissed out the day of trial actually compounded the problem. Then we have, on day three of the trial, juror 125 admitting she had been approached on day one of the trial. She didn't come to the judge the next day. She came on the third day, and she came because juror 159, who also heard of it, instructed her to do so. But juror 159... She came on the morning of the third day, to be fair on the time frame, right? Yes, yes. She came on the morning of the third day. She was approached in the evening of the first day. Of the first day. So she came to court the second day. Exactly. Said nothing. The record shows that the aunt and her had a conversation sometime that second day, and she came the morning of the third day. But I believe that the aunt found out from the aunt's sister, not from the juror herself. Does the record show when the aunt found out? There's differing testimony between juror 125 and 159. If I can look that up on the rebuttal, I will point that out. But juror 125 then also only mentioned three people that she had told, and one of them was not the aunt. She had told a friend and her brother and her sister. Later we found out in the actual trial that took place in July. This trial was in May 2010, the trial in July where the juror was the primary witness. We found out that her testimony was slightly different, that she actually knew the person who approached her, had had a relationship with him. None of this was disclosed to us in chambers. It was that she knew him from seeing him, were her words. But she had texted to her relatives that she didn't want to be on this damn case, because it was a high-profile drug case. And so she was expressing all this reluctance to serve, and yet in chambers, when the judge asked, well, can you be fair and impartial, she said yes. But there's no question that she was afraid, felt threatened, and didn't want to serve as a juror. And didn't serve on the deliberation? No, she didn't. But what we don't know is, because no explanation was given to the jury itself, as far as I know, we have two jurors who are brought out and questioned, and the next thing the rest of them know is that they're sequestered. And I find it very hard to believe that there was no discussion about why. I mean, that was adding, certainly, to the prejudice. Well, is there any evidence of any jury taint? Any evidence of that? I'm sorry, I didn't get it. And whether anything was said to any of the other jurors. We don't know, because they were never questioned. So all of that creates a question. And then we had a third person who was actually on the jury and did deliberate, and we found out after the case finished, from the last witness who testified for Mr. Terry Woods, that the person had been a co-worker of both the witness and Agent Mark Joseph, who was a very key government witness, that they had worked together in the housing, I think, the Housing and Finance Authority. And so we requested a hearing afterwards because of all of these irregularities, and we never had any type of evidentiary hearing on it. If I may turn to the Brady violations, though, these were far more than just the letter exchanges between Turnbull and Springett and the prosecutors and other government agents saying, when am I going to get my reduced sentence, when are you going to file that motion? There were two letters that we have never seen that were admittedly in the government's possession that were extremely exculpatory and impeachment materials. And I only knew of them by way of reading during the course of this trial, the transcripts from the first trial, where I believe Attorney Colon had made some questioning of Turnbull. Are these the letters between the co-conspirators? Between Turnbull and Isaac that had to do with not implicating a certain person because they didn't want to implicate Mr. Hodge. I have never seen them, although they were identified as being in the possession of an agent, Bryant. They were not, the content was not revealed in the other record. No, I could only, they were never produced in that case as well. I had asked Attorney Colon if she had them. So I was like stabbing in the dark with my questioning based on a transcript from an earlier trial. And in this case, Agent Joseph admitted that the letters were obtained, that they were given to Mr. Bryant, Agent Bryant, and no further investigation had ever been done, even though this case came to a second trial. And this was brought to the attention of the district court. Well, it was by motion. It came out through my attempt to cross-examine Mr. Turnbull. And in each instance he said, well, if I had the letter, you know, yes, I think that's true, but if I had the letter, he said that almost every time to every question. So I looked like I was badgering him to the jury, like, why don't you show him the letter already, if there's a letter? I didn't have a letter, never had it. The government had it. Although late, they were produced late. Not these letters. These two letters have never been produced. They have never been produced. The other letters that were produced were some of which were directed to the very prosecutors that were handling the trial. And they were produced, I think, on a Wednesday night at 8 o'clock or maybe Thursday night, somewhere mid-trial at 8 o'clock at night. And the court's decision was that it would cure what the judge was calling Jenks material, because the government was calling it Jenks material, but much of it was Brady material. And so those letters were produced. And then we said, well, where are the envelopes? Because many of these letters don't have dates on them. And then they just gave us envelopes, not with letters. So we didn't know what letter went with what envelope. And so we were then forced to re-cross-examine in front of a sequestered jury, people who had already been cross-examined. And again, we looked like we were badgering the witness and torturing the jury. But it shouldn't have happened like that. Those things should have been produced before trial. In the case of the letter exchange, the singular letter exchange, we may have wanted to call Agent Bryant, who was the holder of these letters, because obviously some discussion had taken place between him and the recipients of the letters. We were never given that opportunity. And that, I think, was the most egregious Brady violation out of all, because those letters talked about cooking the case, manipulating evidence. And in the case of Mr. Claxton, the fact that he got a Rule 29 verdict, I think, speaks to the thinness of the evidence against him, albeit it was reversed. It still speaks to the weight of the evidence. And in his case, Isaac was the key witness against him. All right. Ms. Moorhead, we'll hear you on rebuttal. Thank you. Mr. Jones. Please record, Nelson Jones for the United States. With respect to the speedy trial issue, the... Ms. Brooke Moorhead indicates that... Could I... I'm sorry. ...invert the issues there and address the Brady issue first with the agreement of my colleagues? I would like to hear that one. With respect to the Brady issue, Your Honor, the government submits that the court directed the government to produce the witnesses for recross once the letters were delivered to the defense counsel. Are these the letters between Turnbull and Isaac that you're talking about? In all honesty, I'm not certain. All I know... What I know is the letters that are referred to in the record as far as the letters that were in the... No, no. She's not talking about those letters. She's talking about letters between the defendants that were not produced. She says the others were produced but produced late. How about the other two letters? I'm uncertain if those are the two letters, Your Honor. That would apply to Mark as well, would it not? That was the same thing, was it not? I don't believe so. Mark was three years prior. Was that part of her argument in her brief that she didn't see those two letters between the co-defendants? I didn't see that in her brief, Your Honor. I'll have to ask her. I'm not too sure I saw it myself. I know it was written up concerning the ones that were produced late. That wasn't so hot either, but at least you got cross-examined on those. But the two that were... I'm not too sure I saw that in the briefing. We can check that out. But anyway, would you address with respect at least now to Claxton's claim that these were talked about but never produced? She doesn't know what's in them? What are they? Where are they? And do you have any argument that would convince us that the district court should not have at least held a hearing to inquire into their existence? I don't. With all honesty, Your Honor, the question concerning the two letters is in fact in for clarification. With respect to the two letters between Turnbull and Isaac, it's my understanding that there was testimony in the first case that in fact there was communication between Turnbull and Isaac concerning these letters. So that testimony was there in the September 2007 trial. I can say that I could not, nor could any of us in my office, find them in the record any place. Which indicates to me that something was not decided in the district court, or at least they would have been someplace in the record, would they not? I would assume so, yes, sir. With respect to the speedy trial violation, Attorney Brooke Morehead indicates that the triggering date is the date of the indictment. We do not agree with that. We believe the triggering date is the date the person is arraigned in the charging district under the Speedy Trial Act. But even there, he was detained in Puerto Rico for what, 30 some odd days? Correct. I believe so. Well, is that a Sixth Amendment violation? Not per se, Your Honor. Well, under the Barker theory, unless you can justify that, and it's your obligation to show he wasn't prejudiced, and the other Barker factors, what right do you have to arrest someone and then warehouse them in Puerto Rico for all that period of time? Over 70 days. I'm not talking about Speedy Trial Act. I'm talking about the Sixth Amendment. I understand, Your Honor. The question would become then, Your Honor, where was the prejudice? Well, you have to show there's no prejudice. He doesn't have to. I understand, Your Honor. And when you submit there was no prejudice. The defendant was brought over in July of 2008, and in fact went to trial with the other co-defendants, other co-conspirators that were still pending trial in the District of the Virgin Islands. So there was no prejudice. He wasn't held back to the point that he had to have his trial subsequent to the others who were still scheduled for trial. So you submit there was no prejudice, Your Honor. Well, he claims there was prejudice because he was unable to marshal a defense, speak to people before the case got cold. I don't know. And there's never been an evidentiary hearing on that. That's true. There's never been an evidentiary hearing. Well, don't we have to send this back to a district court to look at these barker factors? I don't believe so, Your Honor, because basically let's assume for purposes of this argument that he had been brought over immediately and had been detained, he would have still been in Puerto Rico. If he had been detained, he would have still been sent to Guayana, Puerto Rico, and that's where he would have been until it was time for him to have his trial, until there was an evidentiary hearing for some other reason. He would have been assigned a lawyer, and he would have been on his way, but that didn't happen. But he had a lawyer when he was arrested in Florida, and that lawyer still was representing him. That representation had not been terminated. So he had a lawyer. So the bottom line is that even though he stayed a long period of time in Puerto Rico that he should have, he was not prejudiced because he had an attorney in Florida who represented him in a Florida matter. That Florida attorney still was representing him when he was in Puerto Rico, and when he was brought to the District of Virgin Islands, he was appointed another lawyer. But he had a lawyer while he was in Puerto Rico, so he was not prejudiced in any way. With respect to the issue concerning the pretrial publicity, there's no question that there was publicity in the case. There's no question that the Mark case took, the Mark Rico case took place about two or three weeks prior to this particular case. However, when the jury was asked whether they had heard or read anything about the case, only one juror indicated that they had heard anything about the case, and that juror indicated it could be fair and impartial in rendering a verdict. So the question was asked of the jury panel whether they in fact had heard or read anything about the case, and only one juror responded in the affirmative. Additionally, the court made every effort to make sure that no persons in the panel for this case had been involved in the Mark case two or three weeks prior. And in fact, there had been one, and that person was excused. You do admit, though, I mean, you don't contest, that the district court never weighed the Barker factors. There's never an evidentiary on the Barker factors on a Sixth Amendment speedy trial right. No, there was not an evidentiary on that. Does that mean that we have to remand it back to the district court? If the court finds prejudice. Isn't there a requirement that there be presumptively prejudicial delay before you start the Barker? And that's what I'm talking about. There has to be some prejudice before you get into the Barker issue. If you don't find a presumptive delay, that is, in most of the cases dealing with the Sixth Amendment violation, you're talking about 70, 80, 200 months delay. We're not talking about that here. Is the time between indictment and arrest excludable for that formula? Yes, our position is under the Speedy Trial Act and under the Sixth Amendment violation that you start counting when the person reaches a district in which the charges are pending. And if you start counting in a district in which the charges are pending, he arrived in a district on July 21, 2008, and he was tried, he was brought before the court, he was advised, he was given counsel, and we submit that there was no delay. Well, that's for Speedy Trial Act, the day of his initial appearance and so forth. But they warehoused him in Puerto Rico for quite a while before they brought him here. I won't use the term warehousing. How would you describe it? He wasn't charged with anything. He wasn't given a lawyer. He was charged. There was an outstanding warrant and there was an indictment against him. But there was no hearing, was there? There was a hearing in Florida, and he waived his removal hearing. He had counsel from the very beginning. He had counsel in Florida. He had counsel at the hearing in Florida. He had counsel when he waived his removal. He had counsel all the way through, and that's what the government is asserting, that there was no prejudicial delay. He had counsel all the way through. From the very beginning, from the time he was arrested in Florida, he had counsel. But he was never brought to trial. He was brought to trial. Well, not until he got back from Puerto Rico. That's the complexity of the federal system here in the Virgin Islands. The only place you can house federal prisoners is in Puerto Rico. There is no federal facility in the Virgin Islands. So therefore, they have to go through Puerto Rico. Well, it's the government's problem, not his. He's got a Sixth Amendment right to his feet. I agree it's the government's problem, but the bottom line is there was no prejudicial delay. He was brought over from Puerto Rico. He was assigned an attorney, and in fact, Moses was filed, and he went to trial with the rest of his co-defendants. Ms. Moorhead, we'll have you back on rebuttal. That's good. Just going back to the last argument, there is nothing on the record that shows that Mr. Claxton had any representation whatsoever for the 84 days following his arrest when he was transported to Puerto Rico. He had counsel in Florida for two days, April 23rd and April 24th, and on the 25th, they sent him to Puerto Rico. And basically, the Florida action was closed. He had waived his rights without prejudice to a detention hearing to speed up the process, was transported and held for... In other words, his initial appearance before a judicial officer was where, in Florida? In Florida, in the Middle District. But so he spent 84 days in Puerto Rico without having an appearance before a judicial officer. Exactly, from April 25th, 2008. He didn't know what he was charged with. He was not charged until he appeared at the initial appearance, the second initial appearance in the Virgin Islands. But he was arrested in Puerto Rico.  In Florida. And then they sent him to Puerto Rico. But where was the initial appearance when he was told the charges against him? I believe that it was in the Virgin Islands. We have in the record the only record that we have from the Orlando Division in the transcript, Joint Appendix 52. He was given a lawyer in Florida, so I have to assume. And the lawyer knew what the charges were. So in Florida, he had his initial appearance, so to speak. But then they sent him to Puerto Rico for 84 days without any further proceedings. Your real claim here is that 84 days was unnecessary and prejudicial. Yes, and that the district, the prosecutors in this district knew that he had been arrested. How was he prejudiced by that 84 days? I mean, can you point to any evidence that he could have used, obtained, or something that happened? Someone died that would have been available? You know, something like that. No, I think to begin with, 84 days without being basically incommunicado, not having any representation, is oppressive. There are reasons why you are required to be brought before the court in a timely fashion, and it's the prosecutor's job to make sure that happens. What's the closest case that you can cite to, with respect to the mere passage of time, raising that presumption of prejudice that would require him to come forward, the government to come forward and show lack of prejudice? I don't think I have a case for 84 days. I mean, this is a very unusual case. I think that somebody would be held without coming, being brought to actually answer to the charges for 84 days without counsel. I will agree with you there. But do you have a case that has some time in there? Your friend across the way talked in terms of hundreds of minutes. And in that case, it was 40, 45-month delay was presumptive prejudice. In the Hakeem case, it was found to not be presumptive prejudice, but that was only 14 months. So we're closer now to when we have a December 2006 indictment and a May 2008, I'm sorry, 2010 trial. We're approaching. We're three and a half years into it. Well, if we're talking Sixth Amendment, that's what I was arguing. Let me ask you one question about these Brady letters. You alluded very vaguely in your brief to the Brady letters, the letters between Turnbull and Isaac. In fact, the only reference I see to them is on page 32 of your brief. Now, you claim that you knew about these exchanges from the prior trial. Is that correct? Well, during the course of this trial, I went back and focused on cross-examination of these particular witnesses and saw that there was an admission of these letters. Did you ask? The letters were admitted, correct? No. These letters were never produced. There was an admission that the letters existed? Yes. I had questioned actually not just Turnbull, but questioned the government agent. And he was the one who told me that they were in the possession of the government and that they had been turned over. Let me see. This is Mark Joseph. Did you ever ask for them? During the course of the trial? Yes. Well, I was trying to find out where they were. I'm talking now. This is on the Joint Appendix 268, starting there. I'm asking Mark Joseph. He said he was aware of it, and I'm asking him now. I think we came in possession of a letter. Who is we? Myself and Agent Goldfinger. All right. You came in possession of a letter. Who was it from or to or both? Who wrote the letter? I think it was Mr. Turnbull. And that letter was written to whom? Mr. Isaac. Were there any other letters that came to your attention? You mean that he received, right? That's the court. Any other letters between Turnbull and Isaac that you received? No, not that I'm aware of. Did you do any follow-up investigation with the agents in North Carolina to see if they had any letters between those two individuals? I don't think so. No. Did you speak to Mr. Turnbull, Elton Turnbull? Yes. Did you ask him were there letters? I don't recall. Well, when you spoke to him, did you have any conversation with him, any follow-up conversation with him? Let me interrupt for a minute. With that information, then did you make a request or had you made a Brady request? I had made a Brady request and I had made it right before trial. I was made twice. Then you learn of these lessons. What did these letters from this passage you're reading right now, what did you then do? Well, I continued in the trial. Did you make a request for these two particular letters? I know about the other letters that, you know. But I got to tell you that until this came up in our law, and I read your brief, I read it twice. And that went over my head because it wasn't something that I knew existed or that you had ever made a demand. And there doesn't appear to be a demand on those two letters. As for the other letters, of course. There was a general Brady demand. Yes. Made twice. But when these were produced, did you make a specific Brady request that they weren't producing letters? Because obviously the government didn't think they amounted to anything, not within Brady or whatever. Because it was between co-defendants, so they would have thought it wouldn't help you at all. I don't know. I did not make a specific request at trial. You did not direct your motion for a new trial on Brady to these letters, did you? Yes, Your Honor. Did you raise this before the district court? Yes. There was a separate motion filed, which is in the appendix. On these two specific letters? Yes, these two specific letters. Did you allege that you never ever received these letters? Yes. Did the district court look at that? I assume so, but he never ruled on our Brady motion. And that was in your motion for a new trial. Is that correct? I put two separate motions. One had to do specifically with these violations. That was a Rule 33. I did a Rule 29, and in that I raised all of the issues that led to the acquittal and also raised the drug evidence issue in the Rule 29. But I made a separate Brady motion, which is part of the appendix. Did you make this motion when the case came back? When the jury came back? When the case came back from our court. Oh, no, I made this at the same time I made the Rule 29 motion. And the court had never ruled on it? No, he treated it like it was Jenks material. So when the case came back to the district court, when we reinstated the conviction, did the case merely go to resentencing? Yes. And there was no order by the court disposing of your motion for a new trial? No. Then this may not even be final. We may not even have a final judgment here. You have to do this all over again, a third time. Are you sure of what you say? In my motion. It's part of the transcript. Because I have a record here that says the district court denied your motion for a new trial. You have what? I have a summary that says that the district court denied your motion for a new trial. I didn't get an order in this case on that motion. All right. We'll look at the docket. We can look at the docket. I'm sure that it is in here. I understand your position. What we didn't discuss was the drug evidence which was touched on in the Carrie Woods argument. We all know that you didn't discuss it in your principle argument either and you went way over your time. Well, I have it in the brief. And I have also in the brief the safety valve argument. Okay. All right. Thank you very much. We will take this and these matters under advisement and we will return tomorrow at what time, Bill? 10 a.m.